### UNITED STATES of America

v.

### Tyrone Vincent SHORT, Appellant.

### No. 77–1412.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 26, 1977.

Decided Feb. 3, 1978.

Robert A. Robbins, Jr., Washington, D. C. (Appointed by this Court), for appellant.

Charles H. Anderton, Jr., Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Peter E. George and Steven R. Schaars, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before McGOWAN, LEVENTHAL and ROBB, Circuit Judges.

Opinion for the Court filed by LEVENTHAL, Circuit Judge.

LEVENTHAL, Circuit Judge:

This is an appeal from a judgment of conviction for unlawful possession of a con-

trolled substance with intent to distribute that substance. The defendant-appellant claims that the heroin found in his possession was the product of an unlawful search. We remand for further inquiry into the circumstances surrounding the seizure.

## I. BACKGROUND

On October 27, 1976, Metropolitan Police Officer Elliot Carter and his partner were driving along 17th Street in Northwest Washington. As they drove south from T to S streets, they heard a radio run about a burglary that had occurred 15 minutes earlier, near the corner of 17th and S streets. The broadcast advised that the first of the two burglary suspects was a Negro male approximately 18 to 19 years old, 5' 9" to 5' 10" tall, 145 to 155 pounds, with a short Afro-bush haircut and dark complexion. He was described as wearing a camel-colored, waist-length leather jacket and blue trousers. The second suspect was described only as a Negro male.

Several minutes after the broadcast, Officer Carter and his partner saw a man reaching into a parked car in the 1600 block of Swann St., a location some one and a half blocks from the scene of the burglary. That man then approached a woman in the street and appeared to exchange something. The officers approached the man and woman, and identified themselves as police officers. As they did so, they saw the appellant and another Negro male leave a car parked nearby and walk away from the officers. Officer Carter noticed that one of the men, the appellant, had a short bush haircut and wore a waist-length, brown-colored jacket and blue pants.[1]

Officer Carter approached the appellant and told him that he was a suspect to a burglary and would be taken to the scene for possible identification. The appellant was given a *Miranda* warning. Prior to escorting him to the scene of the burglary, Officer Carter searched the appellant and found a brown bag containing 25 packets of heroin. When the appellant was brought to the burglary site, he could not be identified as one of the burglars. However, the heroin found on the search led to the drug offense charge and conviction.

The appellant moved to suppress the heroin as the product of an illegal search. Specifically he contended that the arrest was without probable cause. The motion to suppress was denied and appellant's conviction followed.

## II. THE LEGALITY OF THE SEARCH

Since *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the courts have recognized the diversity of street encounters between police and the citizenry at large. Whenever individuals are confronted by police authorities, they enjoy constitutional protection against unreasonable searches and seizures. The reasonableness of a search or seizure depends on the circumstances surrounding the confrontation and the intrusiveness of the search or restraint involved in the seizure.

If there is "probable cause" for an arrest, the arresting officer may conduct a full search of the suspect's person.[2] In *Bailey v. United States*, 128 U.S.App.D.C. 354, 358, 389 F.2d 305, 309 (1967), this court described the requisites of probable cause as follows:

> The police must have enough information to "warrant a man of reasonable caution in the belief" that a crime has been committed and that the person arrested has committed it.[3]

---

1. Suppression Hearing Tr. of January 19, 1977, at 6.

2. *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973).

3. *Quoting Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

*See, e. g., Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (probable cause is "defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense'"; *quoting Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)).

In this case we do not find the probable cause required to justify an arrest for burglary. We concede that the case is a close one, but the description received over the police radio fits many young people in that area of Washington. This was particularly so given the apparent confusion over the precise meaning of "camel-colored." [4]

The probable cause requirement is the chief bulwark against "investigatory arrests" proscribed by the Fourth Amendment. *See Davis v. Mississippi*, 394 U.S. 721, 726–27, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). It is meant to minimize the possibility of subjecting innocent people to the harassment and embarrassment of involuntary detention and a probing search of person or effects. Here the proffered grounds for probable cause were insufficient to narrow the number of suspects to a level tolerable under the Fourth Amendment. The

arresting officer himself conceded that on the basis of the description given over the police radio, police officers went throughout the area picking up suspects. He testified that when he brought the appellant to the scene of the burglary, it was his understanding that a number of other suspects were also there.[5]

■ The fact that there was no reasonable basis for an arrest does not mean that the police officer could not take action on the basis of the police radio run. When he saw the appellant he had a reasonable, articulable suspicion that the appellant might be connected with the crime, and this was sufficient to warrant an investigative stop under *Terry*.[6] Pursuant to such a stop the officer was free to take the appellant to the nearby scene of the burglary for possible identification,[7] and such an identification would have given the police officer proba-

---

4. During the hearing on the motion to suppress, Officer Carter stated that he interpreted "camel-colored" to mean "brown." At the preliminary hearing he testified that he thought it meant "tannish-brown." Suppression Hearing Tr. of January 19, 1977, at 14. When shown a picture during the suppression hearing of the jacket that the appellant was wearing when arrested, Officer Carter described it as a "darker type brown." *Id.* at 15. Upon examination of the same picture, this court would label the jacket "reddish brown." Regardless, Officer Carter obviously was looking for individuals with a jacket of any arguable shade of brown. As such, the description was not of itself probable cause for arrest.

5. Suppression Hearing Tr. of January 19, 1977, at 19.

   One observer has stated, "courts have generally taken the position . . . that an arrest may not be made upon a general description when the circumstances, including the lapse of time and size of the area being searched, are such that more than one person would likely fit that description." LaFave, *"Street Encounters" and the Constitution* : Terry, Sibron, Peters, *and Beyond*, 67 Mich.L.Rev. 39, 80 (1968). *See Gatlin v. United States*, 117 U.S.App.D.C. 123, 326 F.2d 666 (1963); *Bailey v. United States*, 128 U.S.App.D.C. 354, 361–65, 389 F.2d 305, 312–16 (1967) (Leventhal, J., concurring).

6. *See generally Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

   As the Supreme Court explained in *Adams v. Williams*, 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972) (citations omitted):

   In *Terry* this Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

   *See United States v. Brignoni-Ponce*, 422 U.S. 873, 880–82, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Wylie*, 186 U.S.App. D.C. —— at ——, 569 F.2d 62 at 70–71 (1977) (investigative seizure must be reasonably related in scope to the justification for its initiation).

7. In *United States v. Wylie, supra* note 6, at ——, 569 F.2d at 70, this court, in an opinion by Judge McGowan, approved the return of a suspect to the scene of the crime after a *Terry* investigative stop. Obviously the reasonableness of such action will depend on the grounds of the articulable suspicion and the burdensomeness of the temporary detention. Given the short distance to the scene of the burglary and the description in the radio run, we would have found such action reasonable in this case.

ble cause for arrest. And a *Terry* stop would have justified a patdown search for weapons.[8]

▉ But the government, which has the burden to establish a justification for the search,[9] made no effort to show that the search was limited to weapons.[10] If we had to decide the case on the record as it now stands, we would likely conclude that the fact that only a soft bag was recovered

indicates the search was not of a kind limited to weapons. As the Supreme Court observed in *Terry*, "[a] search for weapons in the absence of probable cause to arrest . . . must, like any other search, be strictly circumscribed by the exigencies which justify its initiation." [11]

The focus for both counsel in the suppression hearing was the existence of probable cause for arrest.[12] That focus suggests that

---

**8.** *Terry v. Ohio*, 392 U.S. at 27, 88 S.Ct. 1868.

**9.** *Id.* at 21, 88 S.Ct. at 1880 ("in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion").

**10.** The colloquy on the search between the Assistant U.S. Attorney and the arresting officer was limited to the following:

THE WITNESS: . . .

Okay. After observing these two individuals get out of the car and walk westbound, I approached them and identified myself as a police officer and I explained to him as to why he was being stopped and I also advised him he had the right to remain silent.

I advised him that he would be taken back to the scene for positive identification in connection with the burglary that had just occurred at 1724 S Street.

At this time I asked my partner to call for a transport to take these individuals back to the scene for positive identification.

BY MR. SCHAARS:

Q. Sir, did there come a time when the gentleman who was arrested was actually frisked or searched?

A. Yes, there was.

Q. Was anything recovered?

A. A brown bag was recovered.

Suppression Hearing Tr. of January 19, 1977, at 7.

There was no further discussion of the search during the suppression hearing.

**11.** 392 U.S. at 25–26, 88 S.Ct. at 1882.

Suffice it to note that such a search, unlike a search without a warrant incident to a lawful arrest, is not justified by any need to prevent the disappearance or destruction of evidence of crime. . . . The sole justification of the search in the present situation is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.

*Id.* at 29, 88 S.Ct. at 1884. *See Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

**12.** Although the encounter between the appellant and Officer Carter is referred to at points in the suppression hearing as a stop, *see* note 10 *supra*, it is clear that both parties regarded the detention as a full arrest. *See, e. g.*, Suppression Hearing Tr. of January 19, 1977, at 4 (direct examination of Officer Carter):

Q. Sir, specifically, on that day, directing your attention to the neighborhood of 1:30 in the afternoon, did you have occasion to participate in an arrest?

A. I did.

Q. Do you see the person who was arrested in Court at this time?

A. I do, sir.

*Id.* at 18, 34–35 (exchanges between defense counsel and the court):

MR. ROBBINS: Your Honor, I would like to find out whether there were other police officers involved in looking for these subjects.

THE COURT: What's that got to do with this?

MR. ROBBINS: It would tend to show whether or not this arrest was an investigatory arrest, whether there were other police officers involved in the area picking up people, looking for people.

THE COURT: How would he know?

MR. ROBBINS: I am asking him if he does.

\* \* \* \* \* \*

It was an investigatory arrest. I don't want to build this up too much, but they were going over the area and picking up people that matched the description.

THE COURT: If they hadn't, they ought to be fired, don't you think?

MR. ROBBINS: Yes, Your Honor. But I think there had to be a little more than just a few things that matched.

THE COURT: Let's get down to some basics. You contend, of course, that when Mr. Short was picked up and taken over to be looked at by the victim of the burglary that he was arrested.

MR. ROBBINS: Yes, Your Honor.

THE COURT: So, in other words, he is the same now as some of these other people. It was not a Terry type thing.

MR. ROBBINS: No, Your Honor.

government counsel was aware that what the officer carried on was the kind of full search that depends on the justification of an arrest. *See United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). However, to avoid any possibility of injustice to the government, we will provide that on remand the government will be free in a new suppression hearing to proffer evidence, if such be the fact, that the actions of the officer, which revealed the bag of drugs, were a reasonable "frisk" for weapons.

Since we acknowledge the possibility, however unlikely, that the heroin will be found to have been properly seized, and in such event we think it sound that the conviction stand without a new trial, our order will not vacate the conviction. Instead we remand the record with direction to hold a new suppression hearing, if possible within a month, if the government claims that the officer was conducting only a limited search for weapons.[13]

*So ordered.*

THE COURT: I want to make sure that assertion was not being made here. All right.

So if the arrest was arrest for probable cause then, of course, the search was legal.

MR. ROBBINS: Yes, Your Honor. And we are submitting that it's not based on probable cause, because of the factors that I have just gone through.

Finally, the Court concluded, *id.* at 37:

I think there was probable cause for the arrest. There being probable cause for the arrest, it was a legal arrest, and being a legal arrest, it was certainly a legal search.

13. If the government does not make such a claim, it is requested to advise this court promptly, so that we may enter a judgment reversing the conviction. Should the government claim that the search was a limited search for weapons and should that claim be rejected by the District Court, that court has authority to vacate the conviction. If the government makes such a claim and it is accepted by the District Court, the record will be returned to this court, and the appellant will be permitted to file a supplementary memorandum seeking reversal if such memorandum is filed within 40 days of the return of the record. The government will have 30 days to respond.