UNITED STATES of America,

v.

Larry G. MEADOWS, Andrew K. Peay, and Leonard Meadows, Defendants.

Crim. No. 94–0465 (JHG).

United States District Court, District of Columbia.

Feb. 22, 1995.

James Robert Holloway, Federal Public Defender for D.C., Cheryl Denise Stein, Washington, DC, for Larry G. Meadows.

Sol Zalel Rosen, Washington, DC, for Andrew K. Peay.

James Wilson Richmond, Jr., Washington, DC, for Leonard Meadows.

Jennifer Mary Anderson, Frederick Walton Yette, U.S. Attorney's Office, Washington, DC, for U.S.

## *MEMORANDUM OPINION AND ORDER*

JOYCE HENS GREEN, District Judge.

On December 1, 1994, a grand jury returned a twelve-count indictment charging defendants Larry G. Meadows, Andrew K. Peay and Leonard Meadows with various violations of federal narcotics and firearms laws and District of Columbia firearms and theft offenses. All three defendants subsequently moved to suppress the physical evidence against them and any statements they made to police officers. A hearing was held on these motions to suppress on February 21, 1995 and a jury trial was to commence upon resolution of the motions, if appropriate. For the reasons expressed below, defendants' motions to suppress are granted.

### I. *Background*

On November 10, 1994, at approximately 7:10 p.m., Metropolitan Police Department ("MPD") Officers Darryn Robinson and Vincent Barlow were on patrol in the 1900 block of Bladensburg Road, N.E., several blocks from the Fifth District police station. The officers were in plain clothes and an unmarked car. At that time, a lookout for an armed robbery suspect was voiced over the radio.

The radio transmission instructed the officers to be on the lookout for a black male, five feet nine inches tall and 140 pounds with a medium brown complexion, who had committed an armed robbery approximately twenty minutes before. The suspect, who was described as wearing a brown leather jacket, jeans, brown suede boots and a black knit "ski-type" hat, was last seen in the 800 block of 21st Street, N.W. He was armed with a .38 caliber handgun and in possession of $45 in cash and a brown leather jacket with a green collar stolen from the complainant. The complaining witness was in the police station with Sergeant Sullivan. *See* Government's Exhibit 1 (tape of radio runs). The officers did not write down the description, and Officer Robinson testified that he remembered the clothing description but not the physical build of the suspect.

Although the lookout indicated that the armed robbery suspect was in the 800 block of 21st Street, N.W., Officer Robinson believed that the suspect was in the 800 block of 21st, N.E. There were two bases for this assumption. First, Officers Robinson and Barlow are members of the MPD's Fifth District. Officer Robinson, who had been with the MPD for five years, testified that members of the Fifth District would not receive a radio lookout for a suspect believed to be in the 800 block of 21st Street, N.W., but could receive a radio lookout for a suspect believed to be in the 800 block of 21st Street, N.E. Second, the lookout indicated that the complaining witness was in the police station with Sergeant Sullivan and there is a Sergeant Sullivan in the Fifth District. Although the officers did not attempt to verify their assumption with the dispatcher, the assumption was clearly reasonable.

The officers drove through the parking lot of the Master Hosts Inn ("Inn"), located near the corner of New York Ave. and Bladensburg Road, N.E. This location is approximately nine blocks from the scene of the robbery. As they drove, they noticed an individual (later identified as Larry Meadows) whom Officer Robinson believed matched the lookout. That individual was about to get into the driver's side of a car parked in the Inn's parking lot. Larry Meadows, a black male of medium brown complexion, is six feet one inch tall and weighed 247 pounds on November 10, 1994. He was wearing a black leather jacket, "light colored pants", brown suede boots and a black knit cap. Two other men were with the suspect. One of these two men (later identified as Leonard Meadows) was carrying a green duffel bag. The duffel bag was 18–24 inches long with a handle on either side and a zipper that did not work. In addition,

Officer Robinson testified at the motions hearing that one of the men, whom he could not identify, was carrying a bag of food and that the three men were heading into the parking lot from the area of the restaurant of the Inn.

The officers emerged from their car and identified themselves. Officer Robinson, who is five feet ten inches tall and weighed 185–190 pounds on November 10, 1994, approached Larry Meadows and asked him where he was coming from, and Larry Meadows responded "Room 102." Officer Barlow asked the other two men where they were coming from and Officer Robinson testified that the response was, "Room 102 also." Leonard Meadows testified that he told Officer Barlow that he was "visiting" someone in the hotel. Officer Robinson then told Larry Meadows that he matched a lookout for an armed robbery suspect and that he would be patted down and brought to a "show-up". Officer Robinson, who testified that Larry Meadows was not free to leave at any time, detained Larry Meadows while Officer Barlow asked the dispatcher to repeat the lookout. Larry Meadows was brought near the radio so that he could hear the lookout replayed. The dispatcher then repeated the lookout to the officers and Larry Meadows. This lookout was similar to the first lookout in all material ways except that it did not include the height and weight description and described the suspect's leather jacket as black in color. *See* Government's Exhibit 1. Officer Robinson testified that after Larry Meadows heard the lookout he said words to the effect of "Yes, I match the description." [1]

Officer Robinson then informed Larry Meadows that he was going to pat him down. Before the patdown began, Larry Meadows spontaneously said, "I'm dirty." Officer Robinson asked what this meant and Larry Meadows replied, "I have a gun, but it's not a .38." In response to another question, Larry Meadows indicated where the officer could find the gun. Officer Robinson found a loaded .45 caliber handgun in Larry Meadows' right waist band and Officer Barlow handcuffed Larry Meadows. All of this interaction between Larry Meadows and Officer Robinson occurred over approximately two minutes time.

Next, Officer Robinson approached the second man (later identified as defendant Peay) and told him he was going to be frisked for the officers' safety. The officer testified that Peay was not free to leave now that a gun had been recovered from Larry Meadows. Before the patdown began, Peay spontaneously said, "I'm dirty too." Robinson then handcuffed Peay and found a loaded .38 caliber handgun in his waistband.

After recovering the handgun from Peay, Officer Robinson placed both handguns that had been recovered on top of a car. He then ordered Leonard Meadows to get on the ground and told him he would be patted down. Leonard Meadows said that he did not have a gun, which the patdown confirmed. Leonard Meadows was neither handcuffed nor arrested. He was, however, escorted 10–15 feet away from the arrest scene by another officer because the two guns were atop the car.[2] The duffel bag that Leonard Meadows was carrying remained on the ground by the location of the patdown. Officer Robinson testified that Leonard Meadows was free to leave at this point, but Leonard Meadows did not believe he was free to leave.

Thereafter, the manager of the Inn walked into the parking lot. He saw a telephone from the Inn sticking out of Leonard Meadows' duffel bag.[3] Leonard Meadows was arrested for second degree theft. During the search incident to this arrest, police found 83

---

1. The Court notes that Officer Robinson did not testify about this statement at any of the earlier proceedings in this matter and he did not note it on the forms he completed the night of the arrest.

2. It is unclear from the record when the other officers arrived on the scene, but it is undisputed that by the end of the events there were approximately 24 officers at the scene.

3. Leonard Meadows testified that the telephone was in the bag under a pair of pants and a shirt. Because he did not testify that he viewed the contents of the bag after he placed it on the ground, he was not in a position to contradict the officer's testimony that the hotel manager saw the telephone in plain view.

ziplock bags of crack cocaine on Leonard Meadows' person.

The police then searched the other two defendants. From Larry Meadows, Officer Barlow recovered eight ziplock bags of crack cocaine, one ziplock bag of marijuana, cash and a key to Room 102 at the Inn. The police also searched Peay and found a key to Room 255 at the Inn[4] and 30 ziplock bags of crack. As the police removed the hotel key from Peay, he volunteered, "We found it in the hallway near the ice machine."

After the police recovered the drugs, they became excited. Officer Robinson testified that they were all smiling and patting each other on the back.[5] At that point, according to Officer Robinson, Larry Meadows spontaneously exclaimed over and over, "That ain't shit. You ain't seen nothing yet. You'll find out sooner or later, there's more in the room." He apparently added that the "shit" was his even though some of it was found on the others. Officer James Effler also testified that he heard this statement and that it was not in response to any questions.

Officer Effler then asked Larry Meadows to sign a consent form to give the police permission to search Room 102. Officer Effler explained the form to Larry Meadows three times and told him each time that he did not have to sign it, and the form itself indicates that it does not have to be signed. *See* Government's Exhibit 4 (consent to search form). Larry Meadows did sign the consent to search form and Officer Effler testified that Larry Meadows was extremely cooperative. *See id.* Officer Effler also received permission from the hotel manager to search the room.[6]

The police used the key found on Larry Meadows to open Room 102. Inside the room the officers found a duffel bag containing just under 400 grams of crack cocaine (some packaged, some unpackaged), two scales, empty ziplocks, ammunition and a high capacity ammunition clip for a .45 caliber handgun.

While the police searched the room, the complaining witness was brought to the crime scene for a "show-up". This witness indicated that Larry Meadows was not the armed robber. The three defendants were then brought to the Fifth District police station for processing. At that point, for the very first time, the three defendants were informed of their *Miranda* rights.

## II. *Discussion*

■■■ In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court noted that "not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has taken place." *Id.* at 19 n. 16, 88 S.Ct. at 1879 n. 16; *see United States v. Lewis*, 921 F.2d 1294, 1297 (D.C.Cir.1990); *United States v. Winston*, 892 F.2d 112 (D.C.Cir.1989). Indeed, "police officers 'do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some question [or] by putting questions to him if he is willing to answer.'" *United States v. Maragh*, 894 F.2d 415, 418 (D.C.Cir.1990), *cert. denied*, 498 U.S. 880, 111 S.Ct. 214, 112 L.Ed.2d 174 (1990) (quoting *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983)). This Court's first task, therefore, is to determine at what point Larry Meadows was "seized".

■■■ To determine whether a "seizure" has occurred, "the ultimate issue ... [is] whether [the police officer's] conduct constitutes a *show of authority* that would lead a

---

**4.** The telephone found in Leonard Meadows' bag had been stolen from Room 255.

**5.** It is undisputed that the MPD had a program in effect at this time through which officers could earn extra money for recovering guns. Although the two guns recovered in this arrest counted toward Officer Robinson's total, Officer Robinson failed to qualify for the additional compensa-

tion. Officer Robinson testified that this program had no impact on his conduct in this case.

**6.** This officer testified that the Fifth District police pay special attention to the Inn and have made other arrests and seized other guns from this location. Notably, Officer Robinson did not give similar testimony about whether the Inn was located in a high crime neighborhood.

reasonable person to conclude that he is not free to go." *Gomez v. Turner,* 672 F.2d 134, 141 (D.C.Cir.1982) (quoted in *Winston,* 892 F.2d at 115). In other words, a seizure takes place when "a reasonable person would conclude from the circumstances, and the show of authority, that he was not free to leave the officers's presence." *United States v. Brady,* 842 F.2d 1313, 1314 (D.C.Cir.1988); *see United States v. Lloyd,* 868 F.2d 447, 450 (D.C.Cir.1989). This test is, of course, "predicated on a 'reasonable person' who is 'innocent of any crime,' *United States v. Savage,* 889 F.2d 1113, 1116 (D.C.Cir.1989), [because] law enforcement officers are not expected to tailor their conduct to a 'guilty mind, which is especially prone to apprehensions of confinement.' *Brady,* 842 F.2d at 1315 n. 3." *Winston,* 892 F.2d at 115–16.

■ In the instant case, the government attempts to cast Officer Robinson's initial encounter with Larry Meadows as a mere consensual conversation. The government asserts that Larry Meadows was not seized until after the officers replayed the lookout broadcast. This position, however, is undercut by the testimony of the government's own witness, Officer Robinson. Officer Robinson testified that Larry Meadows was *not* free to leave *at any point* during the encounter. The officer further testified that he intended to patdown Larry Meadows from the outset of their encounter. Larry Meadows, therefore, was "seized" at the moment Officers Robinson and Barlow encountered him.

Having determined at what point Larry Meadows was "seized", the question then becomes whether the officers had reasonable articulable suspicion for this seizure. The *Terry* standard is one of "objective reasonableness." *United States v. McKie,* 951 F.2d 399, 402 (D.C.Cir.1991). Consequently, a court is:

> not limited to what the stopping officer says or to evidence of his subjective rationale; rather, we look to the record as a whole to determine what facts were known to the officer and then consider whether a reasonable officer in those circumstances would have been suspicious.

*Id.; see United States v. Bonner,* 874 F.2d 822, 829 (D.C.Cir.1989).

■ In the context of a *Terry* stop that flows from a suspect's description by a crime victim or a tipster, a court must compare the description to the defendant with regard to such factors as clothing, age, race, physical build and proximity to the crime scene. *United States v. Simpson,* 992 F.2d 1224, 1226 (D.C.Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 286, 126 L.Ed.2d 236 (1993). A "confluence of such factors will be sufficient to justify a *Terry* stop." *Id.; see United States v. Clipper,* 973 F.2d 944, 951 (D.C.Cir. 1992), *cert. denied,* — U.S. —, 113 S.Ct. 1025, 122 L.Ed.2d 171 (1993) (stop reasonable where "police received anonymous tip providing detailed description of appearance, clothing, and location of a man").

■ There is simply not the confluence of factors necessary to justify the stop in this case. Larry Meadows did match the clothing description fairly closely. He was wearing a black knit "ski type" hat, brown suede boots and a dark color leather jacket. His pants, which were described as "jeans" in the lookout, were light colored pants that could readily be confused with jeans from even a short distance. *See* Government's Exhibit 5 (photograph of Larry Meadows on the night of the arrest). Larry Meadows also matched some of the physical descriptions of the suspect because he is a black male whose complexion could be considered medium brown.

After these several factors, however, the similarities between Larry Meadows and the description on the lookout fade. Larry Meadows was seen nine blocks from the crime scene. While this is not unusually far to traverse in twenty minutes, it does begin to suggest that Larry Meadows is not the robber. *See Simpson,* 992 F.2d at 1225 (suspect arrested within one block of the crime scene); *United States v. Short,* 570 F.2d 1051, 1054 & n. 7 (D.C.Cir.1978) (suspect arrested within two blocks of the crime scene). Further, the lookout was for a lone man on foot; Larry Meadows was with two companions and headed for an automobile.

These relatively minor discrepancies could be overlooked in light of the similarity in clothing, race and complexion. When viewed

in conjunction with the physical build of Larry Meadows, however, these factors mandate suppression. The lookout was absolutely clear: the suspect was a black man who was five feet nine inches tall and weighed 140 pounds.[7] Larry Meadows is six feet one inch tall black man who, on the night of his arrest, weighed 247 pounds. This is a difference of four inches in height and *107* pounds in weight. It is impossible to conclude that a reasonable officer could have believed that Larry Meadows matched the lookout based on these factors alone. The *gross* disparity between the lookout and Larry Meadows on these two factors is particularly critical because, unlike clothing and location, height and weight cannot be altered in twenty minutes time.

Officer Robinson may not be a good judge of height and weight from a distance.[8] He may, therefore, have been justified in approaching Larry Meadows initially due to the clothing description alone. However, once he stood next to Larry Meadows, Officer Robinson had to realize that the lookout was for a man shorter and 45–50 pounds lighter than the officer himself, and Larry Meadows is three inches taller and 57–62 pounds heavier than the officer himself. At that point, Officer Robinson should have let Larry Meadows go and the interaction between the police and these defendants should have ceased.

■ Having concluded that the initial stop of Larry Meadows was not justified by reasonable articulable suspicion, all of the evidence or statements seized by the officers as to all three defendants must be suppressed. *See Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963) ("the exclusionary prohibition extends as well to the indirect as the direct products of such [unlawful] invasions"), and its progeny; *United States v. Dawkins,* 17 F.3d 399,

407–08 (D.C.Cir.1994). The officers would never have recovered any of the evidence, be it the drugs and guns on the defendants themselves or the drugs and ammunition in the hotel room, without the benefit of the constitutionally offensive stop. As a result, all of the evidence is the "fruit" of this unlawful stop and must be suppressed. *See Dawkins,* 17 F.3d at 408 ("The rule mandating suppression encompasses all indirectly derivative evidence, until the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" (quoting *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939))).

### III. *Conclusion*

The Court is not oblivious to the realities of the world and the serious action it takes this day. It is fully aware of the problems that face our country; particularly the incredibly awful problems that drugs and guns have wrought on countless persons who live in and visit cities such as Washington, D.C.

Viewed in this context, it is indeed a most difficult decision for this judicial officer to suppress evidence in a case in which two loaded guns (one on each of two defendants) and tremendous amounts of narcotics have been recovered. This is not a case of innocence. Nonetheless, while the Fourth Amendment has been narrowed substantially over time, it has not been eliminated. This Court's inquiry, therefore, ends at the beginning with the initial encounter between the police and Larry Meadows. Since the initial *Terry* stop fully violated the constitution, it cannot be sanctioned. The Fourth Amendment demands more.

Accordingly, it is hereby

ORDERED that defendant Larry Meadows' motions to suppress are granted; it is

---

7. The Court does not discredit Officer Robinson's testimony that he did not remember the height and weight descriptions of the robbery suspect. A reasonable officer, however, would have asked that they be repeated.

8. *Subsequent* testimony proved that Officer Robinson was not a good judge of height and weight even at closer viewing. When shown a picture of Larry Meadows taken prior to the time of his

arrest, the officer indicated that Larry Meadows still looked like the picture even though it was clear to all counsel and the Court that he had lost a substantial amount of weight since the photograph was taken. *See* Defendant's Exhibit 4. Counsel proffered at the bench that Larry Meadows had lost approximately 50 pounds since his arrest and subsequent incarceration.

FURTHER ORDERED that defendant Andrew Peay's motion to suppress is granted; and it is

FURTHER ORDERED that defendant Leonard Meadows' motion to suppress is granted.

IT IS SO ORDERED.