# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 4, 2016        Decided April 29, 2016

No. 14-3051

UNITED STATES OF AMERICA,
APPELLEE

v.

MARK STUBBLEFIELD,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cr-00171-1)

*Joshua M. Parker* argued the cause for appellant. With him on the briefs was *David W. DeBruin*, appointed by the court.

*Lena H. Hughes*, Bristow Fellow, U.S. Department of Justice, argued the cause for appellee. With her on the brief was *Elizabeth Trosman*, Assistant U.S. Attorney. *Suzanne G. Curt*, Assistant U.S. Attorney, entered an appearance.

Before: TATEL, BROWN, and MILLETT, *Circuit Judges*.

Opinion of the Court filed by *Circuit Judge* BROWN:

BROWN, *Circuit Judge*: This case is, at its core, a fact-intensive dispute over probable cause. Witness descriptions of a serial robber—a middle-aged black man of short build and facial disfigurement—helped produce a police sketch, which was then used in canvassing efforts, which netted an identification, which led police officers to the identified suspect, and their approach prompted that suspect, Mark Stubblefield, to flee for two blocks until he was apprehended and arrested. We are asked to decide whether, in view of this totality of circumstances, probable cause to arrest Stubblefield existed. We hold that it did.

I

Between January and April 2008, an unknown suspect committed a series of bank robberies in Washington, D.C. Witnesses described the robber as a thin, middle-aged black man, of short build—between 5'1" and 5'3"— and possessing an unusual facial complexion. Descriptions of his complexion varied slightly. Some used the word "scarring," while others used terms like "markings," "birthmarks," "divots," or "impressions . . . under his cheeks." However, all acknowledged the disfigurement.

Video surveillance showed a man, matching the robber's description, running down a nearby street and hopping in a taxi cab just minutes after one of the robberies. FBI Special Agent Luis DeJesus tracked down the cab driver, who had been paid with a marked $20 bill the day before. The driver recalled dropping the man at 7th Street and Florida Avenue.

Using a sketch produced from witness descriptions, FBI agents canvassed nearby areas and distributed "wanted"

posters throughout Washington D.C. in search of anyone who might recognize the robber. In early May, one individual did. This person recognized the subject as a man who frequented the area of 7th Street and Florida Avenue NW, the same location identified by the cab driver. A few days later on the morning of May 12, this same individual informed the FBI that he or she had again spotted that same man, whom the informant referred to as "Mark," this time at 7th and Rhode Island Avenue—a few blocks from Florida Avenue.

Some time after receiving this tip, two officers went to the intersection and approached a man who matched the robber's description. When the man saw them, he ran; they pursued and apprehended him two blocks away, where he was promptly arrested and searched. The search uncovered a small, inch-and-a-half long crack pipe in the suspect's pocket. The arresting officers made no mention of the bank robberies in their arrest report, listing possession of drug paraphernalia as the basis for the arrest.

The suspect, now identified as Mark Stubblefield, was booked, photographed, and processed. Agent DeJesus incorporated Stubblefield's booking photograph into a photo array containing pictures of eight other men. He showed the array to two of the seven eyewitnesses. One witness, a branch manager, positively identified Mr. Stubblefield based on the photograph. The other, a teller, initially stated the photo didn't match, but then added, "It really looks like him, I'm not sure, you know, I don't know." Based on the manager's positive identification, Agent DeJesus obtained and executed a separate arrest warrant, this time charging Stubblefield with bank robbery.

Before trial, Stubblefield's attorney filed two motions to suppress—one, alleging in-court and out-of-court testimony

stemmed from impermissibly suggestive identification procedures, and the other, concerning Stubblefield's post-arrest statements and actions at police headquarters. Neither motion alleged a Fourth Amendment violation.

At trial, the government called thirty-seven witnesses. None of the eyewitnesses identified Stubblefield in court. Their testimonies focused, instead, on their pre-trial identifications and descriptions of the robber. Only Detectives DeJesus and Elmer Baylor identified Stubblefield in court. And aside from these pre- and in-trial identifications, the government put on no other evidence directly linking Stubblefield to the bank robberies.

Nonetheless, a jury convicted Stubblefield of six counts of bank robbery and one count of attempted bank robbery, and he received a sentence of 180 months' imprisonment. This court affirmed his conviction on direct appeal, s*ee United States v. Stubblefield*, 643 F.3d 291 (D.C. Cir. 2011), and Stubblefield comes before us now on a motion to vacate that conviction due to ineffective assistance of counsel (IAC), pursuant to 28 U.S.C. § 2255(a). The district court denied Stubblefield's motion and declined to issue a certificate of appealability. *United States v. Stubblefield*, 931 F. Supp. 2d 118 (D.D.C. 2013).

II

Stubblefield's ineffective assistance of counsel argument is relatively straightforward: He contends his booking photograph was obtained in violation of the Fourth Amendment, and had his counsel moved to suppress it, there wouldn't have been sufficient evidence to sustain a conviction. To prevail on an ineffective assistance of counsel motion premised on a Fourth Amendment claim, the

5

defendant bears the burden of "prov[ing] that his Fourth Amendment claim is meritorious." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). Attempting to carry that burden, Stubblefield, through court-appointed Amicus, asserts three separate, if overlapping, grounds for suppression: one, the police lacked reasonable suspicion to stop him; two, the crack pipe was discovered through an impermissible search; and three, the government lacked probable cause to arrest Stubblefield for bank robbery. As the foregoing recitation demonstrates, Stubblefield proffers "a substantial showing of the denial of a constitutional right," and we grant his request for a certificate of appealability. *See Slack v. McDaniel*, 329 U.S. 473, 484 (2000). Accordingly, we review his IAC claim *de novo*. *United States v. Abney*, 812 F.3d 1079, 1087 (D.C. Cir. 2016).

Affirming the district court's conclusion that there was probable cause to arrest Stubblefield for bank robbery would render inert his other two arguments, both of which are premised on a lack of reasonable suspicion. So we begin there. Determining probable cause requires examination of the totality of circumstances rather than facts in isolation. *Illinois v. Gates*, 462 U.S. 213, 231–32 (1983). Like a mosaic formed from many pieces, it is the whole picture, viewed from the proper perspective, that deserves our attention. No single piece, no matter how colorful or ornate, can duplicate the impact of the image formed when the parts are viewed together. Here, proper attention to the totality of Stubblefield's case—to the entire pattern—creates a portrait that clearly supports the district court's finding of probable cause.

Three facts in particular shape the portrait. First, the witness descriptions of the robber uniquely identify and clearly match Stubblefield's characteristics. Witnesses

described the robber as a middle-aged black man, of thin, short build and with some sort of facial disfigurement. Of these descriptions, two are particularly distinctive: the height and the facial disfigurement. As to the robber's height, witnesses identified the robber as between 5'1" and 5'2".[1] Given that, for black men ages 40–59, a height even of 5'5" is considered the bottom fifth percentile,[2] the robber's height—which matched Stubblefield's height of 5'2"—is a unique identifier. In addition to the robber's unusually short build, he exhibited unique facial disfigurement. While it's true that witness descriptions toggled between "scarring" and "divots" and "markings," many eyewitnesses readily noticed the robber's distinctive facial disfigurement. And again, the described disfigurement, another unique identifier, was consistent with Stubblefield's disfigurement. Second, two different sources put the robber at or very near the location where Stubblefield was arrested. The cab driver told police he dropped the robber off at the intersection of 7th and Florida Avenue. And a citizen-informant told the FBI that a man matching the robber's description frequented that exact same intersection. Stubblefield was ultimately apprehended a few blocks from there—7th and Rhode Island—after

---

[1] Stubblefield attempted at trial and again here on appeal to suggest other witness descriptions put the robber's height around 5'5" or 5'6". Amicus Reply Br. 5. As support, Amicus directs the court to a colloquy at trial between defense counsel and a branch manager in which the branch manager could not recall what height she told police, only that the robber "was a smaller gentleman, probably below average" who was "possibly" "five-foot five or shorter." S.A. 139. Thus, the discrepancy was minor and equivocal; the consensus described an exceptionally short male.

[2] *See* U.S. Dep't of Health & Human Servs., National Health Statistics Reports: Anthropometric Reference Data for Children and Adults: United States, 2003-2006, Oct. 22, 2008, at 16, *available at* http://www.cdc.gov/nchs/data/nhsr/nhsr010.pdf.

receiving another tip from the same informant. Third, when the police followed that tip to 7th and Rhode Island and approached Stubblefield, he fled and eluded the police's chase for two blocks. Whether any of these facts is sufficient alone for probable cause or whether reasonable suspicion ripened, at some point, to probable cause, we need not decide. Placed alongside each other, these three pieces—the witness descriptions matching Stubblefield's unusual visage and physique, Stubblefield's location at or near the place witnesses had previously seen him, and his flight from the police—form a convincing depiction of probable cause.

In an attempt to divide and minimize, Amicus responds by isolating and impeaching each fact. Regarding the witness descriptions, Amicus contends "the perpetrator's *one* distinctive feature" was his "scarring or mark[ings] on his face," and asserts Stubblefield lacked that one feature. Amicus Br. 26. And absent that one feature, Amicus avers, Stubblefield matched only the generic descriptions, which is insufficient since "there were almost certainly other short, black men somewhere between the ages of 36 and 50 in the area." *Id*. at 25. But here, Amicus overplays its hand in two important respects. First, the record doesn't support the argument that "scarring" was the robber's *one* distinctive feature. To the contrary, witnesses described the robber as possessing a facial complexion more similar to Stubblefield's than the one Amicus depicts. *See e.g. Stubblefield*, 931 F. Supp. 2d at 120 ("unusual facial complexion"); Trial Tr. day 1 at 89 ("a very sunken face" with "bumps"); Trial Tr. day 3 at 42 ("I don't know whether it was gashes or wrinkles, but you could definitely see marks, an indentation in his cheeks"). To be sure, witnesses equivocated on whether it was a scar, bad skin, bumps, or divots, but one thing was clear: the robber had *some* sort of disfigurement, and that disfigurement was consistent with Stubblefield's. Second, Amicus glosses over

just how distinctive the robber's height is and, thus, how relevant it is to our probable cause calculus. Individuals a full three inches taller than Stubblefield *still* fall in the bottom fifth percentile. There are relatively few middle-aged men of such height in America. There are even fewer middle-aged men of such height who *also* have visible facial disfigurement. That Stubblefield matches both supports a finding of probable cause.

None of the cases Amicus cites persuades us otherwise. For instance, the Supreme Court found no probable cause to search a traveler's luggage for drugs in *Reid v. Georgia*, 448 U.S. 438 (1980). That traveler had no luggage other than a shoulder bag, arrived from Fort Lauderdale (a hotbed of cocaine trafficking), and arrived early in the morning when law enforcement presence is diminished. Those circumstances, the Court explained, "describe[d] a very large category of presumably innocent travelers." *Id.* at 441. That conclusion is unsurprising, since finding probable cause there would have meant everyone traveling from Fort Lauderdale in the early morning with light luggage forfeited the Fourth Amendment's protection. Nothing even approaching that scenario exists in Stubblefield's case.

And our conclusion that no probable cause existed in *United States v. Short*, 570 F.2d 1051 (D.C. Cir. 1978), is easily distinguishable from the case at hand. We concluded a description consisting of a black "male approximately 18 to 19 years old, 5'9 to 5'10" tall, 145 to 155 pounds, with a short Afro-bush haircut and dark complexion, . . . wearing a camel-colored, waist-length leather jacket and blue trousers" was not sufficiently specific. *Id.* at 1053–54. But unlike Stubblefield's, those descriptors (with the possible exception of the suspect's clothing, distinguishable for other reasons) are extraordinarily common characteristics that "fit[] many

young people in that area of Washington." *Id.* at 1054. It was precisely for this reason we concluded the description was "insufficient to narrow the number of suspects to a level tolerable under the Fourth Amendment." *Id*. Stubblefield's is a very different case. We are convinced that if the description in *Short* had identified a thin, middle-aged black man, approximately 5'2" tall with facial disfigurement, the number of suspects would have narrowed to a tolerable level.

As to location, Amicus advances two arguments, both centered on the informant's tips. First, Amicus contends that, since little is known about the tipster, the tips were unreliable. Because we know nothing of the informant's identity or record, Amicus argues, we are unable to "infer" much at all about the tipster's credibility. *Id.* To the contrary, the reliability of this informant's tip, obtained in a face-to-face encounter with FBI canvassers, surpasses others the Supreme Court has previously blessed. *See Alabama v. White*, 496 U.S. 325 (1990) (concluding an anonymous tip exhibited sufficient indicia of reliability to justify an investigatory stop); *Navarette v. California*, 134 S. Ct. 1683 (2014) (holding that an anonymous call reporting apparent drunk driving was sufficiently reliable). In-person tips are "inherently more trustworthy" than anonymous ones. *United States v. Thompson*, 234 F.3d 725, 729 (D.C. Cir. 2000).

Amicus's second argument indicts the lack of record evidence concerning how much time elapsed between the informant's May 12th tip and the officers' arrival at 7th and Rhode Island. Amicus suggests the record reveals only that "both occurred in the morning" and requests, at the very least, an evidentiary hearing to fill in the gaps. Amicus Reply Br. 8. It is true the record is incomplete. But even if we were to discover, after supplementing the record, that the police dithered for an hour before arriving at the scene, it wouldn't

change our conclusion.[3] The citizen-informant who provided the tip told police the individual "frequented the area," which suggests the person hangs around longer than, say, a passing commuter. Thus, even if there was a long response time, the person identified by the informant was likely still in the vicinity. Moreover, as we noted earlier, the individual identified by the informant, by the robbery witnesses, and ultimately by the police possessed not one, but two extraordinarily rare characteristics. Given all the other evidence suggesting probable cause here, whether the police promptly pursued the tip or not would hardly alter the probable cause mosaic at all.

Finally, Amicus argues Stubblefield's flight from police does not add anything to this portrait of probable cause because the record does not demonstrate his flight was "headlong" or "unprovoked." Amicus Br. at 30. Those terms come from the Supreme Court's decision in *Illinois v. Wardlow*, in which the court held that "[h]eadlong" or "unprovoked flight" can suggest wrongdoing and justify further investigation. 528 U.S. 119, 124–25 (2000). While we agree the record is scant, we do not agree with Amicus's ultimate contention for two reasons. First, the record tells us that Stubblefield "fled on foot," that "[a] chase ensued," and that he was ultimately apprehended two blocks away from where he was first approached. Aff. in Support of Arrest Warrant for Mark Stubblefield at 4. The *Wardlow* opinion

---

[3] This is unlikely, in any event. In his original arrest report from May 12, the arresting officer noted the time of the arrest was 7:49 AM. Thus, before 7:49 AM, the officers received the tip, arrived at the scene, approached Stubblefield, chased him two blocks, stopped him, patted him down, discovered drugs, and then arrested him. While it is true the record does not say when the informant called the police, the arrest was made early enough in the morning to dampen fears that an alarming delay occurred.

strikes an explicit contrast between a person's "right to ignore the police and go about his business" and "unprovoked flight upon noticing the police." 528 U.S. at 124–25. Whatever can be made of the scant record before us, it is clear Stubblefield's flight and attempt to outrun the police were "just the opposite" of "going about one's business." *Id.* at 125. And second, this piece of the mosaic must not be viewed in isolation. If all we had before us was an instance of unprovoked flight, the probable cause question would favor Stubblefield. *See United States v. Sharpe*, 470 U.S. 675, 706 (1985) (Brennan, J., dissenting) ("[F]light *alone* cannot give rise to probable cause."). But that's not all we have before us. We've already shown how the witness descriptions, combined with Stubblefield's location, at the very least contributed to a reasonable suspicion of wrongdoing. That is crucial— because while flight alone cannot sustain a finding of probable cause, it *can* when "coupled with pre-existing reasonable and articulable suspicion." *Id.*

III

As we said at the outset, this case is fundamentally about probable cause, a "fluid concept[,] turning on the assessment of probabilities in particular factual contexts." *Gates,* 462 U.S. at 232. This case's factual context, its assemblage of interlocking pieces, reveals a mosaic that clearly depicts probable cause. Because the FBI had probable cause to arrest him for bank robbery, Stubblefield's Fourth Amendment argument for suppression is not meritorious and, therefore, his ineffective assistance of counsel claim fails. The decision of the district court is accordingly

*Affirmed.*